IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:06CR474-1 |
| | ) | |
| | ) | |
| RODNEY ANTON WILLIAMSON | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Rodney Anton Williamson's pro se Motion to Reconsider, Pursuant to Rule 59(e) [Doc. #403] and Motion to Amend Motion to Reconsider, Pursuant to Rule 59(e) [Doc. #404]. For the reasons explained below, the Motion to Amend is granted[1] and the Motion to Reconsider is denied.

Williamson asks for reconsideration of the Court's May 24, 2021 Memorandum Order [Doc. #402] and requests appointment of counsel to assist. As an initial matter, for the reasons explained in the May 24, 2021 Memorandum Order, Williamson's request for counsel is again denied.[2] (See Mem. Order at 2-3.) In support of reconsideration, Williamson challenges the Court's prior explanation affirming the two-point enhancement for his role as a manager or supervisor. He argues the analysis is insufficient for appellate review according to United States v.

---

[1] In his motion to amend, Williamson requests to add two pages of the Government's trial brief in further support of his motion to reconsider.
[2] It is also noted that Williamson has effectively advocated for himself throughout the pendency of his motions related to 18 U.S.C. § 3582(c)(1)(A)(i).

Burnley, 988 F.3d 184 (4th Cir. 2021), and erroneously relies on the offense conduct described in the Presentence Report which Williamson contends came directly from the Government's trial brief and contained evidence not ultimately presented at trial. He also disputes the sufficiency and outcome of the Court's assessment of his sentencing objections, the jury's finding that Williamson was accountable for more than 400 kilograms of cocaine hydrochloride, and reliance on the testimony of government witnesses.

The Court has reviewed its orders addressing Williamson's motions pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the bases in support of the previous findings that Williamson has not shown extraordinary and compelling reasons for relief, his most recent arguments for reconsideration, the Presentence Report, and the trial transcript. This renewed assessment does not change the Court's previous determinations that Williamson was appropriately enhanced as a manager or supervisor of at least one person, the evidence supports the jury's finding that he is guilty and responsible for more than 400 kilograms of cocaine, and, other than the fact that he is no longer a career offender or subject to the statutory enhancement, his sentencing objections do not change the outcome. Moreover, Williamson has still not met his burden of showing an extraordinary and compelling reason for relief.

First, when determining the propriety of an enhancement under § 3B1.1 of the United States Sentencing Guidelines, Courts "must consider seven factors":

2

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

Burnley, 988 F.3d at 188 (alterations in original) (quoting United States v. Cameron, 573 F.3d 179, 184 (4th Cir. 2009)). As the Burnley court explained, the enhancement is appropriate where, for example, "defendants directed organized drug trafficking by managing and advising street-level dealers, setting prices and payment terms, and arranging acquisition and delivery logistics." Id. On the other hand, the enhancement does not apply "even though the defendant was a mid- to upper-level member of the trafficking ring, selling drugs to his own clientele and to other members of the conspiracy who, in turn, sold drugs to their clientele" or when "a co-conspirator was responsible for chauffeuring the defendant to his buyers, and various co-conspirators sold drugs for him". Id. (internal quotations omitted) (citing cases).

At trial, Christopher Swaney, whom Williamson described as "his right-hand man", testified that he and Williamson recruited people, namely "Ricky"[3], Eddie Alberty, and "Ray" (the latter only known to Williamson), to drive the stash vehicles, return the proceeds of the drug sales to Texas and New York, and transport cocaine back to Swaney and Williamson, work for which these recruits

---

[3] Ricky died before trial. (Trial Tr. Aug. 16, 2007 119:1-8, 165:18-21 [Doc. #226].)

3

were paid. (Trial Tr. Aug. 15, 2007 29:14-30:20 [Doc. #225]; Trial Tr. Aug. 16, 2007 93:6-21 [Doc. #226].) Ricky worked for both Swaney and Williamson, but Williamson used him more than Swaney did. (Trial Tr. Aug. 16, 2007 53:1-14.) Swaney also testified about a trip that Ricky and Williamson made from Raleigh, North Carolina to New York in May 2006 where they were to acquire cocaine arriving from the Virgin Islands. Because Ricky was a native New Yorker, he was to serve as Williamson's navigator and driver through the city. After they picked up Michael Sealy from the airport, Williamson sent Sealy "to make a 10-kilo drop upon some individuals" in the area. (Id. at 54:23-56:5.)

Williamson also sent Ricky to the airport to pick up Louis Rabsett and Lance Thomas from the Virgin Islands, the latter of whom Williamson was courting as a supplier. (Id. at 117:11-20, 118:19-119:10.) When Rabsett was asked if Williamson gave him money to facilitate communication with Thomas, he testified that Williamson helped him out by giving him money. (Id. at 120:9-18.) Rabsett also understood that the cell phone Thomas eventually used in the Virgin Islands to communicate with Williamson was given to him by Ricky. (Id. at 122:11-19.)

Glenson Isaac testified that in 2004-2005 he fronted Williamson the $20,000 per kilogram cost of cocaine from the Virgin Islands. A week later, Williamson's friend Toriana Cave would pay Isaac the $200,000 Williamson owed, and Isaac would then send $180,000 of that payment to the Virgin Islands. Isaac and Williamson had two or three more transactions that operated similarly;

4

Williamson would be fronted the cost of the cocaine and Cave would make the payment for Williamson. (Id. 84:9-87:22.)

The Burnley factors weigh in support of applying the two-point enhancement for managing or supervising at least one person.  This was an international conspiracy to distribute cocaine from the Virgin Islands and Mexico to Texas, North Carolina, and New York with Williamson's participation part of the key to its success.  He exercised decision-making authority, a high degree of participation in planning and organizing the conspiracy, and control and authority over others when he recruited Ricky, Ray, and Alberty to transport drug sale proceeds and cocaine to and from Texas and New York, entrusted and directed Cave to settle his $200,000 debt with Isaac on several occasions, directed Ricky to help establish a relationship between Williamson, Rabsett, and Thomas to source cocaine from the Virgin Islands and to facilitate Sealy's sale of cocaine in New York, sent Sealy to make a 10-kilo drop in New York, and developed Thomas as a source in the Virgin Islands.

Next, Williamson continues to challenge the drug amount that the jury attributed to him and now also contends that the Court "has an obligation to carry out a more precise review of the testimony of the government witnesses" because their testimony may "have been altered or affected by the January 29, 2007 recording."  He further argues that "the government witnesses' trial testimony alone contributed to the trial jury accountable drug weight of more than 400 kilograms of cocaine hydrochloride" yet "[t]here was no evidence presented at trial that [he] physically possessed any drugs or money" and "[t]here has been no

5

determination if the government witnesses' testimony is not a derivative of the January 29, 2007 recording." First, the government was not required to prove that Williamson "physically possessed any drugs or money." Next, Swaney, Isaac, and Sealy testified about the amount of cocaine purchased or sold by Williamson and Swaney as part of the conspiracy, and this testimony supports the jury's finding. (See Trial Tr. Aug. 15, 2007 33:2-34:2, 35:1-37:2; Trial Tr. Aug. 16, 2007 55:10-56:9, 84:9-87:22, 130:1-131:23, 138:9-140:21.) Furthermore, Williamson's counsel had an opportunity to – and did – cross-examine each of the Government's witnesses.

In addition to the sentencing objections filed by Williamson's counsel and addressed in the Court's prior order, (see Mem. Order at 3-6 [Doc. #402]), Williamson, on his own behalf at his sentencing hearing, had questions about the use of a confidential informant's statements in the Presentence Report who did not testify at trial because he died beforehand, (Sentencing Tr. 2:9-3:7 [Doc. #229]). Because Williamson faced a life sentence at the time, it was determined that resolution of those questions would make no difference. (Id. at 4:7-23.) Williamson now contends the inclusion of those statements in his Presentence Report [Doc. #362] must be addressed. Comparing references to the confidential informant ("CI-1") in the Presentence Report to the trial testimony, it is apparent that CI-1 was "Ricky". Although he was not present to testify because of his death, several witnesses testified about his participation, and those witnesses were subject to cross-examination by Williamson's counsel. In addition, comparing

6

references in the Presentence Report to a second confidential informant ("CI-2"), it is apparent that he was a witness who testified at trial and was subject to cross-examination. The Court heard the evidence presented at trial and, as noted in the prior order, found it credible and sufficient to support the jury's finding of guilt and the drug amount attributed to Williamson, (see Mem. Order at 4).

Moreover, Williamson moves for relief under 18 U.S.C. § 3582(c)(1)(A)(i) for extraordinary and compelling reasons. But, as explained in the Court's previous orders, he has not met his burden of showing that they exist here, even considering that he no longer qualifies as a career offender or for a statutory enhancement. By way of comparison, a review of the defendants in United States v. McCoy, 981 F.3d 271 (4th Cir. 2020), and their circumstances illustrates why.

Thomas McCoy was nineteen years old and only had one prior conviction – for reckless driving resulting in a $120 fine – at the time he committed the robberies and violations of 18 U.S.C. § 924(c) for which he was incarcerated. Id. at 277. Under the law at the time of his sentencing, § 924(c) permitted sentence-stacking which subjected McCoy to a mandatory thirty-two-year sentence consecutive to the sentence imposed for the robberies. Id. He had served over seventeen years of his thirty-five-year (421-month) sentence when he moved for compassionate release based on the First Step Act's elimination of sentence-stacking in § 924(c). Id. If he were sentenced under the First Step Act, his sentence would be less than half what it was, "a disparity of over 200 months." Id. at 278. The district court found that disparity, along with McCoy's age at the

7

time of the offense and lack of relevant criminal history, made "the recidivist penalties of 'stacked' sentences particularly inappropriate." Id.  And, while in custody, McCoy had "many educational and vocational achievements" and made "payments of nearly $10,000 towards a $38,209 restitution order shared among seven co-defendants." Id.  Thus, after "an individualized application" of the factors from 18 U.S.C. § 3553(a), the district court found compassionate release appropriate.

Keith Bryant, Kittrell Decator, and Craig Scott were also convicted of robberies and § 924(c) violations and subject to sentence-stacking which resulted in a mandatory minimum sentence in each case of forty-five years consecutive to the robbery sentence. Id.  The defendants were between twenty-two and twenty-four years old at the time of their offenses; Decator and Scott had no criminal history; and Bryant had one minor prior conviction and served no jail time. Id.  Each of them was sentenced to fifty-two to fifty-three years in prison. Id.  After they had served approximately twenty-five years in prison, each defendant moved for compassionate release based on their rehabilitation and the change to § 924(c). Id. at 278-79.  Were Bryant, Decator, and Scott sentenced under the First Step Act, each of their sentences would have been thirty years less than their original sentences. Id. at 279.  In granting their motions, the district court "took into account [each of] the defendant's youth and minimal criminal history at the time of his offenses; his post-sentencing conduct and rehabilitation; and the fact that continued incarceration would be disproportionate to both 'the seriousness of the

8

offense and to what Congress now deems appropriate for this kind of conduct.'"

Id.

The Fourth Circuit Court of Appeals affirmed. As it explained, "[t]he First Step Act's clarification of § 924(c) resulted in not just any sentencing change, but an exceptionally dramatic one." Id. at 285. The court found

> that the district courts permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act. [It] emphasize[d], as did the district courts, that these judgments were the product of individualized assessments of each defendant's sentence. And [the court] note[d] that in granting compassionate release, the district courts relied not only on the defendants' § 924(c) sentences but on full consideration of the defendant's individual circumstances. In particular, in determining that release was appropriate for all of the defendants, the courts focused on the defendants' relative youth – from 19 to 24 years old – at the time of their offenses, a factor that many courts have found relevant under § 3582(c)(1)(A)(i). Combined with the substantial sentences the defendants already had served at the time of their motions – from 17 to 25 years – that meant that each defendant had spent close to or more than half his life in prison. And during that time, as the district courts explained, each defendant had established excellent institutional records and taken substantial steps toward rehabilitation.

Id. at 286 (internal citations omitted).

Here, although Williamson is no longer subject to a mandatory life sentence or designated as a career offender under the Sentencing Guidelines, the impact of these changes to his sentence is not "exceptionally dramatic" like the nearly twenty to thirty years difference in sentences for the defendants in McCoy. Williamson was sentenced to life in prison which was commuted to 360 months in

9

2017.  In response to his § 3582(c)(1)(A)(i) motion, the United States Probation Office recalculated his Guideline sentence, without the statutory enhancement or the career offender designation, to be 292 to 365 months. (Mem. (Feb. 24, 2021) [Doc. #396].)  It cannot be said that this difference is an "exceptionally dramatic" one.[4]

In addition, Williamson's age and criminal history at the time of the instant offense differ from the McCoy defendants.  Williamson was in his late twenties into his early thirties when he participated in the conspiracy.  His criminal history at the time included felony convictions for offenses similar to the instant offense conduct – possession with intent to sell and deliver cocaine (age 18), third degree possession of cocaine (age 18), and maintain vehicle/dwelling/place for controlled substance, attempt to traffic by possessing, possession with intent to sell and deliver cocaine, and attempt to traffic-transporting (age 24). (Presentence Report ¶¶ 40, 41, 44.)  Williamson received a sentence of twelve to fifteen months' imprisonment for the latter set of offenses, but remained undeterred and, instead, developed a more sophisticated cocaine distribution business spanning several countries and states.

As the Court recently recognized, though, Williamson has done well while in the custody of the Bureau of Prisons.

---

[4] Nor would it be "exceptionally dramatic" even if Williamson were not enhanced for being a manager or supervisor.  His Guideline range would be 235 to 293 months.

10

> To his credit and as he previously argued, he has committed only one
> disciplinary infraction, and that was in 2009. He completed 426
> hours of education courses between 2009 and 2018 and his GED in
> 2010. He is assigned to work in the Central Tool Room, "a security
> based job" that "requires passing an internal investigation and
> background check" according to Williamson. His April 14, 2021
> Individualized Needs Plan included with his motion to amend notes
> that he "receives good work reports from his detail supervisor", "has
> been participating in the Resolve Program and [has] almost completed
> it", "has requested to be enrolled in the Non-Residential Drug
> Program", "is currently enrolled in a Post Secondary Canine Specialist
> class", "currently has saved $500.00 in his pre-release account as
> recommended", and "has maintained clear conduct." This review
> shows marked improvement in Williamson since his May 2019 report
> in which it was stated that "[s]ince last team meeting he has not
> completed any programs due to lack of interest", he had "declined
> Drug Education classes", and he had "not saved any money for
> release as recommended due to lack of interest." (See Mem. Op. &
> Order at 15 [Doc. #394].) In addition, as previously noted, "[i]t is
> apparent from letters he submitted that his family and close friends
> love him, believe in him, and have seen him grow while incarcerated"
> and he appears to have a job awaiting him with All Systems Restored.
> (Id. at 14-15.)
>
> Williamson's earning of his GED, employment, and discipline within
> the Bureau of Prisons are commendable, as is his improvement in
> other areas since his May 2019 Individualized Reentry Plan.

(Mem. Order at 7-8.)

However, these efforts are not themselves extraordinary and compelling. Nor is an assessment of Williamson's circumstances including these efforts while in custody, his age and criminal history at the time of the instant offense, the changes in the law affecting his statutory and Sentencing Guidelines penalties, and other "'bases already addressed – . . . disparate sentenc[es] among co-conspirators, his non-violent background, his low risk of recidivism, his family

11

circumstances, or COVID-19'[5]". (Id. at 8 (quoting Mem. Op. & Order [Doc. #394], Mem. Op. & Order [Doc. #397].)

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant Rodney Anton Williamson's pro se Motion to Reconsider, Pursuant to Rule 59(e) [Doc. #403] is DENIED and Motion to Amend Motion to Reconsider, Pursuant to Rule 59(e) [Doc. #404] is GRANTED.

This the 22nd day of July, 2021.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

---

[5] As of July 21, 2021, the Bureau of Prisons has administered over 200,000 doses of the coronavirus vaccines among its facilities, and 133 staff members and 803 out of 985 inmates at FCI Ashland (where Williamson is housed) are fully vaccinated. Fed. Bur. of Prisons, FCI Ashland, https://www.bop.gov/locations/institutions/ash/; Fed. Bur. of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/. One inmate and one staff member are reported as presently infected. https://www.bop.gov/coronavirus/.

12